OPINION OF THE COURT
Ellen M. Spodek, J.
Petitioner Williamsburg Charter High School (petitioner or WCHS) files this special proceeding and action pursuant to article 78 and section 3001 of the Civil Practice Law and Rules seeking the following relief: (1) review and annulment, pursuant to CPLR 7803, of the determination of the New York City Department of Education (DOE), including the final decision of the Chancellor of the DOE (collectively, respondents), which was issued on April 3, 2012, to revoke the charter of WCHS; (2) a declaratory judgment under CPLR 3001, holding that WCHS is entitled to continue under its charter under such conditions as the court deems appropriate; (3) a temporary restraining order and a preliminary injunction enjoining the DOE from prohibiting or taking any action to interfere with WCHS’s conducting a lottery and registering students applying to enroll for the 2012-2013 school year, until the court decides the matter; and (4) a declaration that the role of present and former DOE employees in cases where they have a personal interest is in violation of New York City Conflicts of Interest Law (NY City Charter § 2604 [b] [4]). Intervenors-petitioners seek to vacate the decision of the DOE and the Chancellor revoking WCHS’s charter based on the fact that intervenors were prevented from participating in a “public hearing” in violation of their due process rights. Respondents oppose both petitioner’s and intervenors’ actions.
Background
Petitioner WCHS is an independent education corporation, organized and maintained under article 56 of the Education Law (Charter Schools Act) and afforded not-for-profit status under Internal Revenue Code § 501 (c) (3). WCHS is currently located at 198 Varet Street, Brooklyn, New York and provides education to students in 9th grade through 12th grade.
On September 30, 2003, the founders of WCHS submitted an application to the DOE seeking a charter for the establishment of a charter school. Pursuant to the Charter Schools Act, Education Law § 2851 (3):
“An applicant shall submit the application to a charter entity for approval. For purposes of this *812 article, a charter entity shall be:
“(a) The board of education of a school district eligible for an apportionment of aid under subdivision four of section thirty-six hundred two of this chapter, provided that a board of education shall not approve an application for a school to be operated outside the school district’s geographic boundaries and further provided that in a city having a population of one million or more, the chancellor of any such city school district shall be the charter entity established by this paragraph;
“(b) The board of trustees of the state university of New York; or
“(c) The board of regents.”
The DOE granted WCHS its charter on February 23, 2004 under Education Law § 2851 (3) (a). The initial charter was approved for a period of five years to run through July 27, 2009. On July 1, 2008, the founder and principal of WCHS, Eddie Calderon-Melendez, applied for charters from the New York State Education Department for two additional schools — Believe Northside Charter High School and Believe Southside Charter High School. In January of 2009, the New York State Board of Regents chartered Believe Northside Charter High School and Believe Southside Charter High School. Allegedly, the plan was that all three schools would be managed by the Believe High Schools Network Inc. (the Network).
WCHS notified the Charter Schools Office of the Department of Education (CSO) of its intent to engage the Network as its managing partner with the submission of its second renewal charter application on February 1, 2009. The CSO staff serve as the Chancellor’s designee as the authorizer for 69 New York City charter schools under his control. The CSO reviewed the application and forwarded it to the New York State Education Department (NYSED) for formal approval on March 9, 2009. NYSED recommended that WCHS amend its charter renewal application by eliminating any reference to the Network until the Network gained authority to do business in the State of New York. On May 18, 2009, the DOE renewed WCHS’s charter for an additional five-year term, ending July 27, 2014. The Network gained authority to do business as a corporation in the State of New York on or about May 20, 2009. On or about August 1, 2009, WCHS entered into a charter management agreement with the Network.
*813 At some point prior to the renewal, on or about March 30, 2009, WCHS entered into a lease agreement for a new facility located at 198 Varet Street, Brooklyn, New York. As a result, American’s Charter School Finance Corporation, by its guarantee, guaranteed to the landlord WCHS’s obligation as tenant. In addition, WCHS applied for a sizeable loan from the Nonprofit Finance Fund (NFF) in order to finance the lease deposit. WCHS contends that the CSO was involved in the structuring of the financing. The DOE claims that the loan agreement violated state charter school law.
In January 2010, WCHS submitted a request to the CSO to revise the school’s charter to add the Network as the management organization with a retroactive date of August 1, 2009. The DOE acknowledged receipt of the request and in turn requested additional clarification and documentation to be sent to the CSO in order to make a final determination. On May 5, 2010, a public hearing was held to learn about the proposed revision to the WCHS charter and to solicit public comments. On May 13, 2010, the DOE requested action by the New York State Board of Regents to approve the request. In the letter, it appears that the DOE found that the revision would: (1) meet the requirements set out in article 56 of the Education Law; (2) permit the charter school to operate in an educationally and fiscally sound manner; and (3) improve student learning and achievement. WCHS asserts that it did not receive any further correspondence regarding the Network until December 6, 2010. At that time, the CSO indicated that it could not approve the request to contract with the Network until certain WCHS internal deficiencies outlined in a management letter dated June 2010 were satisfactorily addressed.
On May 26, 2011, the DOE conducted an annual site visit to WCHS and generated an annual site visit report (site report). The site report was a comprehensive report that consisted of an executive summary, findings and framing questions. The findings section of the report listed WCHS’s “Areas of Strength” and “Areas of Growth.” Around that same time period, the Office of the Attorney General (OAG) began an investigation of WCHS’s founder and former executive director Eddie Calderon-Melendez. WCHS alleges to have fully cooperated with the Attorney General’s investigation, responding to witness and documentary subpoenas. It appears that the OAG’s investigation of Mr. Calderon-Melendez related to his personal conduct in which WCHS had no control or knowledge of his actions.
*814 On September 16, 2011, the Charter Schools Office of the DOE issued a notice of probation to WCHS. The probationary-status was effective as of the date of the letter and was set to expire on August 31, 2012. However, the notice indicated that the period could be extended or shortened in writing by either the DOE or NYSED based on WCHS’s compliance with its charter, applicable laws and regulations or pursuant to Education Law § 2855 (2). The probation notice included a remedial action plan which laid out the steps the school would have to take to remedy the serious charter violations. The CSO and the Board of WCHS met on October 21, 2011 to discuss how the Board was working towards complying with the remedial action plan. In a letter dated October 27, 2011 addressed to Recy Dunn, the Executive Director of the CSO, WCHS requested additional time to sever its ties to the Network. On or about November 10, 2011, the CSO issued a revised remedial action plan extending certain deadlines.
The Board resolved to terminate its relationship with the Network and opted to modify the current organization and reporting structure by creating a chief executive officer position. The Board offered the new position to Mr. Calderon-Melendez despite knowing that he was under investigation by the Office of the Attorney General. Although the DOE had not previously indicated to WCHS’s Board of Trustees that it did not approve of Calderon-Melendez being employed by WCHS, the DOE concluded that the probation had been ineffective and a notice of intent to revoke charter was sent to the Board dated January 9, 2012. Pursuant to the terms of the notice of intent to revoke, WCHS had 30 calendar days to remedy all violations outlined in the notice. WCHS contends significant changes were made to its governance in an effort to satisfy the DOE’s demands, including the termination of Calderon-Melendez. On January 26, 2012 and February 8, 2012, WCHS submitted briefings to the DOE identifying the steps taken to cure the notice of intent to revoke charter. Specifically included in the submissions were applications for new and additional board members, an agreement with Charter School Business Management Inc. (CSBM) and a request for a hearing. The DOE stated that a decision would be made regarding the revocation on or about March 1, 2012. This time was later extended to some time before the first week of April when the charter school lotteries would be held. The DOE neither approved nor rejected the proposed new and additional board members. A “hearing” was set down for March 13, 2012.
*815 On March 12, 2012, the CSO provided WCHS with its position paper recommending revocation of the charter. In short, the position paper stated that the
“CSO had completed its review of the WCHS Response, and determined that it either fails to address or only partially addresses a number of material and substantial violations of the Charter. Moreover, [the] CSO’s ongoing review has brought to light additional information regarding the school’s finances, which [the] CSO believes demonstrates a lack of fiscal soundness that violates both the Charter and the school’s remedial action plan.”
The violations were allegedly centered around fiscal misconduct, illegal or invalid contracts and conflicts of interest. The next day, on March 13, 2012, the hearing was held regarding the revocation issue. WCHS contends that the DOE refused to permit a “public hearing” and to create a reviewable record of the hearing. The DOE claims that although space was limited, the argument was open to the press and the public. In regards to the record, the DOE states that petitioner was informed that an audio recording of the argument was created. At the hearing, the Deputy Chancellor requested WCHS to produce supplemental submissions addressing the long-term debt and its recovery plan. Also at the hearing, the Deputy Chancellor allegedly represented that the decision would be issued by April 1, 2012. On March 19, 2012, WCHS submitted the supplemental documents requested. On March 22, 2012, the CSO responded to the submissions stating that the “CSO does not believe that the school has demonstrated that it has a viable plan to repay the millions of dollars it owes to various creditors.” On March 30, 2012, WCHS notified the DOE that it intended to send applicant parents a letter advising them of the upcoming lottery scheduled for April 4, 2012. Absent a response from the DOE, WCHS intended to proceed with the lottery as scheduled. On April 3, 2012, the DOE issued its decision which revoked the WCHS’s charter and the termination would go into effect as of June 29, 2012. Petitioner filed its petition and complaint on April 20, 2012 and the amended petition and complaint on April 30, 2012.
The Parties’ Contentions
Petitioner
Petitioner contends that the court should vacate the decision of the DOE because it is arbitrary and capricious and a violation of law. Petitioner argues that the decision was not based on *816 substantive evidence, and it fails to provide mandated due process, evidences selective enforcement and fails to comply with the process mandated by the Charter Schools Act. As such, petitioner claims that pursuant to CPLR 7803 (3), the court should vacate an agency determination that is made in violation of lawful procedure, is affected by errors of law, is arbitrary and capricious, or results from an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed. In this case, petitioner argues that the DOE decision is arbitrary and capricious, rife with issues and is procedurally defective on a number of points.
Point I
The petitioner asserts that the DOE failed to maintain a proper record for the court to review the subject proceedings. Failure to keep an adequate record equates to a substantive denial of due process.
Point II
Petitioner states that the decision was arbitrary and capricious because the DOE provides no clear guidelines or time frames on the revocation process. Based on the DOE’s internal documents, WCHS was set to be on probation for a 12-month period beginning in September of 2011. Petitioner contends that the DOE’s decision to reduce the probationary timeline was arbitrary and unfounded. Petitioner contends that at all times via oral and written communication the DOE was apprised of the steps being taken to comply with the revised remedial action plan. However, four months into the probationary period, the DOE issued a notice of intent to revoke charter without notice as to what triggered the reduction of the time period. The DOE further contends that it followed procedures for the revocation process set forth in 8 NYCRR 3.17. However, petitioner contends that the procedure was inconsistent with past practice and is not corroborated by any policy, regulation or protocol established by the DOE. Petitioner’s primary issue is the DOE’s failure to provide WCHS with a public hearing in which the parents and students could be heard. Petitioner states that although the DOE claims the hearing was “public,” it was in fact limited to board members and 10 additional people.
Point III
Petitioner further contends that the DOE’s decision was in violation of lawful procedure because the revocation process followed did not afford WCHS an ability to cure the issues raised *817 in the notice of probation. Petitioner asserts that some of the outstanding issues are incurable because the CSO has purposely prevented WCHS from curing the issues, such as the Board capacity and the agreement with NFF. Additionally, petitioner contends that the DOE was required to issue an educational impact statement.
Point IV
Petitioner claims that the decision was based on erroneous information. Petitioner asserts that there are a number of points made in the Chancellor’s report that were inaccurate, resolved or were contradictory to the record. The decision partially rested on WCHS’s inability to locate members of the community to serve on the Board. However, as stated earlier, WCHS offered viable candidates and the DOE failed to approve much less respond to the potential candidates. As it pertains to the issue of WCHS’s fiscal mismanagement, petitioner contends that all of the financial arrangements that the DOE now calls into question — the lease, the NFF loan and the indemnification, reimbursement and guaranty fee agreement — were all signed in the early part of 2009 prior to the charter renewal in 2009. Moreover, the DOE was involved in obtaining the loan with NFF. As such, petitioner argues that none of the issues stated in the decision amount to “material and substantial” violations of the charter.
Point V
Another point of contention is centered around the internal inconsistency of the CSO in its communication and stance on certain issues. Petitioner proffers that the CSO renewed WCHS’s charter in 2009 although the school management situation and the fiscal arrangements were the same at that time as when the notice to revoke was issued.
Point VI
Petitioner alleges that the decision to revoke was compromised because DOE employees violated New York City Charter Conflicts of Interest Law. Petitioner contends that Joshua Morales worked for WCHS while he was employed with the DOE in the Charter Schools Office. In fact, Mr. Morales was intimately involved with WCHS’s application for the NFF loan as well as the agreement with the Network. Both of these arrangements are now considered to be “material and substantial” violations by the same entity in which their employee played an integral role. Petitioner further claims that Mr. Morales and Mr. *818 Calderon-Melendez worked together at the Network and upon Mr. Morales’s termination from the Network he had a personal vendetta against Mr. Calderon-Melendez. Petitioner believes that current DOE employee Sonia Park, personal friend of Mr. Morales, also played an integral role in deciding the fate of WCHS. Petitioner feels that Park was biased in her decision to recommend revoking WCHS’s charter and took steps to undermine WCHS’s ability to retain its charter.
Point VII & Point VIII
Petitioner also claims that the decision failed to take into consideration WCHS’s side of the story and all of the information provided as it pertains to its debt recovery plan and the willingness of the creditors to work with it on reducing debt. Even more significant is the fact that the DOE did not take into consideration the effect the revocation would have on the community. By not allowing a public hearing, neither students nor parents were able to attest to the negative impact the revocation would have on them. This in effect denied WCHS and the community fundamental due process.
Finally, petitioner raises additional points addressing the fact that revocation under these circumstances is an excessive penalty and an abuse of discretion. Petitioner also asks that this matter not be remanded back to the DOE because, based on the evidence, there is no procedure in place to address revocation protocol. Petitioner also alludes to a potential conspiracy to close down the Believe Network schools, which include WCHS, Believe Southside and Believe Northside.
Intervenors
Intervenors are the parents of the children currently attending WCHS and they adopt the statement of facts set forth by the petitioner. Intervenors adamantly disagree with the DOE’s contention that they do not have a property interest in the continued education provided by WCHS to their children. Similar to petitioner’s argument regarding due process, intervenors argue that they were directly affected and disadvantaged by the DOE’s failure to provide a public hearing to discuss the revocation of WCHS. As such, intervenors state that their due process was denied and the decision of the DOE should be void.
Respondents
Respondents believe that the relief sought by the petitioner is unwarranted because the Chancellor’s determination was neither arbitrary nor capricious. Respondents argue that there was *819 an ample basis on which the Chancellor could reasonably conclude that petitioner’s charter should be revoked. Respondents argue that despite repeated warnings, petitioner failed to fully address: (1) its incredible cash flow problems; (2) its approximately five million dollars of debt; (3) its payment of management fees to the Network in the amount of two million dollars; (4) that it had no credible financial plan; (5) that it had a board riddled with conflicts of interests, including ties to the Network; (6) that its board was ineffective in its oversight of school operations and finances; (7) that it entered into a possibly fraudulent contract with the Network, even though it had not been approved by the CSO; and (8) that it hired as CEO the founder of the Network, who was at the time under investigation by the OAG, for a salary of two hundred thousand dollars with a one hundred thousand dollar golden parachute.
The DOE claims that during the initial five-year period of the charter, petitioner experienced governance problems. The DOE contends that the 2009 renewal application was approved because petitioner made assurances that the governance and financial issues would be corrected. Shortly after the renewal period began, the DOE claims that it became aware of additional and/or continuing issues with petitioner’s operations, more specifically, the application for 10 cash flow loans; the loan agreement with NFF; the agreement with the Network; and the conflicts of interest among WCHS’s board members. In May of 2011, during the annual site visit, the DOE identified a number of violations of the charter and advised petitioner accordingly. By September of 2011, petitioner had not made any significant steps to address the issues discussed in the site report. Accordingly, by notice dated September 16, 2011, the CSO placed petitioner on probation.
In January of 2012, the DOE concluded that based on a series of petitioner’s actions during the probation period, it was evident that it had a pattern of failing to exercise prudent and effective oversight of the school’s operations and finances. As such, the CSO issued petitioner a notice of intent to revoke charter and was given 30 days to rectify all of the issues addressed in the notice. The DOE carefully reviewed petitioner’s response and the documentation provided. Contrary to petitioner’s assertions that it had taken steps to resolve the issues in question, the DOE claims that it failed to address all of the material and substantial violations of the WCHS charter. In particular, the DOE claims that the re-hiring of Mr. Calderon- *820 Melendez while he was currently under investigation by the OAG demonstrated petitioner’s inability to effectively provide oversight of the school’s operations and finances. Subsequently, Mr. Calderon-Melendez was criminally indicted on multiple counts of fraud, including the possible use of petitioner’s funds for personal expenditures.
On March 12, 2012, the CSO provided petitioner with supplemental materials outlining the reasons it was recommending petitioner’s charter be revoked. Oral argument was held on March 13, 2012 and the proceeding was recorded. On or about April 2, 2012, the Deputy Chancellor issued the decision to revoke petitioner’s charter.
Respondents argue that the decision was neither arbitrary nor capricious. The decision was based on the Education Law’s charter school provision which provides that a charter may be terminated for, among other reasons, “[s]erious violations of law” or “[m] at erial and substantial violation[s] of the charter, including fiscal mismanagement” (Education Law § 2855 [1] [b], [c]). Respondents contend that the evidence shows that petitioner violated numerous provisions and/or failed to meet specified deadlines which justified the decision to revoke. Respondents assert that based on Education Law § 2855 (3), once petitioner violated the terms of its remedial action plan, petitioner was entitled to no further process. Therefore, respondents argue that petitioner’s arguments concerning the alleged denial of due process must fail.
Respondents further contend that the Education Law does not define what will constitute an “opportunity to be heard” in the context of this situation. The state allows “oral argument” before a panel of the Board of Regents, however this regulation does not apply to the Chancellor. The DOE opted to use the state procedures as a model for proceedings related to the potential revocation of petitioner’s charter. Accordingly, the DOE allowed petitioner the opportunity to submit a written statement and oral argument. Respondents contend that the hearing was in fact public and an accurate record was held because it was recorded. Moreover, the DOE claims that it was attended by petitioner’s students, parents, staff and board members. Hence, the assertions by both the petitioner and the interveners regarding not having an opportunity for a “public hearing” are untrue. Based on the documents provided by the petitioner to the Deputy Chancellor, a decision was reached that petitioner’s charter should be revoked.
*821 Respondents claim that petitioner’s allegations of bias by the CSO’s former employee Joshua Morales and current employee Sonia Park are unfounded. Mr. Morales is no longer a DOE employee and had no influence on the determination to revoke. As it pertains to Sonia Park, although she was involved in the revocation process, the decision to recommend revocation was ultimately made by Recy Dunn, the Executive Director of the CSO. Moreover, the decision was subject to two other layers of review.
Lastly, respondents contend that contrary to petitioner’s assertions, they were not required to issue an educational impact statement or follow the procedures set out in Education Law § 2590-h (2-a) because it is only triggered when the DOE’s actions affect a public school building. For the foregoing reasons, respondents request that petitioner’s amended verified petition be dismissed in its entirety and that the relief requested therein be denied as the DOE’s determination was neither arbitrary nor capricious, but was a sound and reasonable decision made with an ample basis.
Discussion
In reviewing an agency’s determination in a proceeding brought under article 78 of the Civil Practice Law and Rules, the court is to decide, in part, “whether [the] determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed.” (CPLR 7803 [3].) The court’s determination in these matters must be justified by substantial evidence in support of the petitioner’s assertions that the decision was arbitrary and capricious and/or was an abuse of discretion. The court gives deference to the administrative agencies’ determinations as they are uniquely qualified to make decisions specific to their industry. However, where it appears that an administrative agency’s determination was not achieved by a rational basis, the court is not abusing its discretion by reviewing the evidence and concluding that the decision was made in error.
The arbitrary or capricious test chiefly relates to whether a particular action should have been taken or is justified and whether the administrative action is without foundation in fact. (See Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, *822 34 NY2d 222, 231 [1974].) In order to address the various points of contention between the parties, the court will evaluate the time line and the procedural process of events that lead up to the Chancellor’s April 3, 2012 decision to revoke the WCHS charter. It is undisputed that the DOE granted WCHS its charter on February 23, 2004. The initial charter was approved for a period of five years to run through July 27, 2009. The DOE contends that over the course of the initial five years, the school experienced governance problems. However, on May 18, 2009, the DOE renewed WCHS’s charter for an additional five-year term ending on July 27, 2014.
On May 26, 2011, staff from the CSO conducted an annual site visit of the school and generated an annual site visit report. The site report was divided into three sections: executive summary; findings; and framing questions. Under the findings section, the report identified WCHS’s “Areas of Strength” and “Areas of Growth.” As it pertains to WCHS’s “Areas of Growth,” the following eight header points followed by sub-points were addressed in the site report:
“1. The school should continue to establish a culture of high student engagement, strong academic rigor and consistency across the school.
“2. WCHS has entered into a management arrangement with the Believe Network for academic financial and back office supportive services that has not been approved or recognized by the CSO. In any event, the school should define the roles of key staff members and the school’s relationship with the network office.
“3. The school is encouraged to improve communication between school leaders and staff.
“4. The Board of Trustees should meet bi-monthly, as specified in the school’s bylaws.
“5. The Board of Trustees should enact corrective measures in order to be in full compliance with the 2010 amended Charter School Act regarding conflicts of interest.
“6. WCHS should enact corrective measures in order to be in full compliance with the amended Charter School Act and Education Law Sections 2590-h (15) (a) and 414 (1) (c). Areas of concern regard meeting target rates for enrollment and retention English Language Learners (ELL) and Special Education and the establishment of a formal *823 Parent Organization.
“7. WCHS should enact corrective measures in order to be in full compliance with its Second Renewal Charter Agreement and School Monitoring Plan (2009). Areas of concern regard Governance, Management and Finance.
“8. WCHS is being audited by the NY State Office of Audit Services and under investigation by the NY State Office of the Attorney General concerning its relationship with the Believe Network, corporate governance and financial practices.” (Emphasis added.)
Contrary to the DOE’s contentions that WCHS was put on notice, the court does not find that the information provided to WCHS in the “Areas of Growth” section of the report rose to the level of a warning and/or an indication that the topics addressed were “material and substantial” violations of charter law. The information provided was constructive and was formulated as suggestions/recommendations for improvement. The report did not stress a sense of urgency, nor did it establish actual deadlines for task completion in which WCHS could be held accountable. The court likens the section to a “needs improvement” rating on a report card in that it is not a failing grade.
Nonetheless, the CSO deemed the site report as providing WCHS with sufficient notice and based on the WCHS’s Board’s failure to make meaningful changes the CSO placed petitioner on probation by notice dated September 16, 2011. The probationary status was effective as of the date of the letter, and was set to expire on August 31, 2012 unless (1) extended or shortened in writing by the DOE based on WCHS’s compliance with its charter, applicable laws and regulations, and the corrective action plan outlined below or (2) DOE or New York State Education Department takes further steps to terminate WCHS’s charter pursuant to Education Law § 2855 (2). The remedial action plan requirements were as follows:
“1. Terminate the relationship with the Believe Network by October 31, 2011.
“2. Eliminate overlapping board appointments resulting in conflicts of interest.
“3. Revise bylaws and adopt a new conflict of interest policy.
“4. Revise meeting schedule to include 12 monthly meetings a year.
*824 “5. Provide a fiscal management plan and employ a CSO approved independent fiscal agent.
“6. Conduct an in-depth review of its contracts and agreements with landlord, lenders and vendors to ensure compliance with Charter agreement.
“7. Review operational and financial reporting structure to ensure accountability.
“8. Cooperate with the NYS Office of Audit Services and NYS Attorney General’s Office.
“9. Submit Board of Trustees meeting agendas and information packets to the CSO monthly.”
On October 21, 2011, the CSO met with the Board to discuss the ways in which it would work towards complying with the remedial action plan. Per the Board’s request, the CSO approved a revised remedial action plan which modified certain dates, including extending the deadline to terminate the relationship with the Network to January 31, 2012. However, upon the Board’s resolution to terminate the Network, it passed another resolution to modify its organization and reporting structure by creating a chief executive officer position. The Board offered the position to Mr. Calderon-Melendez. It appears that this decision coupled with State Education Department’s audit resulted in the CSO sending petitioner a notice of intent to revoke charter on January 9, 2012, only four months after the notice of probation. The CSO contends that the Board’s actions during the probation period were indicative of its inability to exercise prudent, effective oversight of the school’s operations and finances. Petitioner discussed the strides it made in order to cure a number of the issues by submitting response letters dated January 26, 2012 and February 8, 2012. Although the petitioner had terminated Mr. Calderon-Melendez, entered into an agreement with CSBM, submitted a list of potential new board members and its fiscal management plan, the CSO recommended revocation in its position paper dated March 12, 2012. Petitioner responded to the position paper on that same day with documents further supporting its position that the charter should not be revoked. Unfortunately, after the oral hearing and submitting supplemental papers on WCHS’s debt recovery plan, the Chancellor made a determination that the WCHS charter should be revoked.
The court finds after a review of the documentary evidence and witness testimony that there are a number of inconsistencies and contradictions within the underlying decision to revoke the charter of WCHS.
*825 The Believe High Schools Network Inc.
Based on the affidavit of Mr. Dunn, Executive Director of the CSO, the agreement between petitioner and the Network was a violation of the petitioner’s charter and was not approved by the CSO. However, based on the time line of events, the CSO as well as NYSED were aware of WCHS’s intent to engage the Network as its managing partner. In fact, NYSED’s only issue centered around the Network not having authority to do business in the State of New York. The intent to partner with the Network was known as early as February 1, 2009, prior to the second charter renewal. After the suggestions made by NYSED, WCHS waited to enter into an agreement until the Network was authorized to do business in the State of New York. The agreement was entered into on or about August 1, 2009. In January of 2010, the request to amend the charter to add the Network was submitted to the CSO. After a public hearing, held in May of 2010, the Chancellor made statutory findings in favor of the partnership. Subsequently, WCHS had no further information regarding the approval until December of 2010 at which time the CSO refused to approve the engagement. Based on the language of the letter, the CSO did not indicate that there were issues with the Network, but that there were issues with the school. Moreover, in the site report, the CSO’s reference to the Network did not indicate that the relationship should be terminated. In fact, although it acknowledged that the relationship was not approved, the report made suggestions as to how WCHS should conduct interactions with the Network going forward. The court finds the entire set of events surrounding the Network appear to be contradictory. The CSO has not identified either in oral argument or in its papers when the agreement with the Network became a “material and substantial” violation of the charter law. Moreover, the CSO was well aware of WCHS’s intentions to engage the Network, prior to issuing the second renewal charter. Had this been a “material and substantial” violation, this should have been addressed prior to the approval of the charter’s second renewal. Lastly, the CSO made a determination that it would not approve the agreement nearly one year from the date that it was made aware of petitioner’s intent. There appears to either be a lack of transparency in the CSO’s decision or a lack of efficiency in making determinations as it pertains to issues of “material and substantial” violation.
*826 Mr. Eddie Calderon-Melendez
As it pertains to the petitioner’s relationship with Mr. Calderon-Melendez, the court understands the CSO’s concern. However, at no point in the probationary notice or in the notice of intent to revoke did the CSO specifically identify Mr. Calderon-Melendez as an issue. Disapproval of the Network does not synonymously equate to disapproval of Mr. Calderon-Melendez. One can infer that the relationship could be intertwined, however as an administrative agency, information disseminated needs to be specific and transparent. If Mr. Calderon-Melendez was in fact the main issue with WCHS’s relationship with the Network, that should have been stated immediately. In addition, based on the information provided, it does not appear that Mr. Calderon-Melendez’s actions as they relate to WCHS were supported or even known by the petitioner until after the indictment.
Nonprofit Finance Fund
Another significant violation identified by the CSO centered around the sizeable loan WCHS applied for from the NFF. As discussed earlier, in order to finance the lease deposit of the new facility and to pay for architectural costs associated with certain renovations and improvements, WCHS applied for a sizeable loan from the NFF. After reviewing the papers, it appears that Joshua Morales, an employee of the DOE working in the CSO, was heavily involved in the planning process of WCHS. Petitioner contends that not only was the DOE aware of the loan, its employee Mr. Morales was involved in securing the loan. As evidenced by an email, the loan was approved on or about November 25, 2008 and both WCHS and the DOE were advised of this fact. On March 30, 2009, WCHS entered into the lease agreement. The court is disturbed with the material information submitted by petitioner that supports the contention that the DOE not only was aware of the loan, but played an integral role in it being obtained. It should also be noted that the loan agreement which respondents are currently characterizing as a “material and substantial” violation of charter law was entered into approximately two months before WCHS’s second renewal charter was granted. At no point, in either the CSO’s proposal to the Chancellor or in respondents’ papers submitted to this court, has this conflict/inconsistency been addressed. This reiterates the court’s earlier contention that the CSO may have lacked oversight in managing the operations of its authorized charter schools or lacked a procedure for determining what constitutes a “material and substantial” violation.
*827 The Revocation Process
During oral argument, respondents admitted that they did not have a process in place as it pertains to revoking a charter. Chad Pimentel, Agency Attorney of the Office of the General Counsel of the Department of Education, acknowledges that in the absence of statutory guidelines in charter law, as it pertains to revocation, the DOE opted to utilize the NYSED’s procedures as a model. Pursuant to 8 NYCRR 3.17, the revocation procedure applies to charter entities being terminated under Education Law § 2855. The DOE has stated that under Education Law § 2855 (1) (c), WCHS’s charter was being terminated due to material and substantial violations of the charter, including fiscal mismanagement. In matters such as these, the NYSED procedure shall be conducted as follows:
“(1) Notice of intent to revoke a charter shall be provided to the board of trustees of the charter school at least 30 days prior to the effective date of the proposed revocation. Such notice shall include a statement of reasons for the proposed revocation. The charter school shall be allowed at least 30 days to correct the problems associated with the proposed revocation.
“(2) The charter school shall be provided the opportunity to submit a written response to the notice of intent to revoke. Such response may include supporting affidavits, exhibits and other documentary evidence and may present legal argument.
“(3) The charter school shall, upon request, be provided an opportunity for oral argument before a panel of the Board of Regents consisting of at least three Regents designated by the chancellor or the Board of Regents.
“(4) After its consideration of the written response and of any oral argument held, the designated Regents panel shall make a recommendation to the full Board of Regents as to whether the charter should be revoked. Such recommendation may include, in lieu of revocation, the placement of the charter school on probationary status pursuant to Education Law, section 2855(3) and the imposition of a remedial action plan, or such other action as the panel deems appropriate.
“(5) The Board of Regents may accept or reject, in whole or in part, the recommendation of the desig *828 nated Regents panel and the decision of the Board of Regents shall be final. The order of the Board of Regents revoking the charter shall also revoke the certificate of incorporation of the charter school.” (8 NYCRR 3.17 [a] [emphasis added].)
However, it is clearly stated in 8 NYCRR 3.17 (b) (1) that this process shall not apply to revocation proceedings commenced by charter entities other than the Board of Regents. As indicated earlier, WCHS was governed by the Chancellor. Nonetheless, the DOE chose to utilize this procedure. It should be noted that the standard for revocation under Education Law § 2855 (2) provides in pertinent part that
“[n]otice of intent to revoke a charter shall be provided to the board of trustees of a charter school at least thirty days prior to the effective date of the proposed revocation. Such notice shall include a statement of reasons for the proposed revocation. The charter school shall be allowed at least thirty days to correct the problems associated with the proposed revocation. Prior to revocation of the charter, a charter school shall be provided an opportunity to be heard, consistent with the requirements of due process.”
In following the process prescribed by the NYSED, the DOE had to make a few adjustments. As noted in 8 NYCRR 3.17 (a) (3), the petitioner should be afforded oral argument in front of a panel of the Board of Regents. In this instance, the Chancellor was the substitution for a panel. However, the court proffers that the legislative intent of the rule was for the decision to be made before a panel so that a decision of this magnitude was not reviewed in a vacuum and that at least three Regents would be rendering an opinion on the proposed revocation.
The DOE contends that it afforded petitioner sufficient opportunities to remedy the alleged material and substantial violations of the charter. Respondents contend that although petitioner was able to cure some of the issues, it was unable to demonstrate that all material and substantial violations of the charter and the law had been resolved. However, the CSO does not identify the number of areas in which it hindered the petitioner from complying with the requirements for compliance.
Petitioner submitted names of new and additional board members to the CSO in its responses to the notice of intent to revoke. At no time prior to the determination to revoke did *829 respondents acknowledge, reject or approve the selected individuals submitted by petitioner, yet this was identified as one of the areas in which the CSO stated was a basis for revocation. Respondents claim that petitioner failed to terminate its relationship with the Network by the January 31, 2012 deadline. However, Mr. Dunn acknowledges that the relationship was terminated as of February 1, 2012 and that petitioner had entered into an agreement on or before February 8, 2012 with CSBM. In regards to the NFF loan, Anne B. Dyjak, vice-president and chief credit officer of NFF, states on several occasions that she contacted the CSO to get clarity on the DOE’s interpretation of the charter school law in order for the loan to be in compliance. The DOE makes no reference to this correspondence. Moreover, to date, there has been no substantive response to the inquiries by Ms. Dyjak. Although the DOE contends that WCHS had ample opportunities to remedy the alleged violations, it appears that it extended no aid in ensuring that petitioner would meet the necessary requirements. In the court’s opinion, it appears that petitioner was set up to fail.
Public Hearing — Due Process
There is a clear contradiction amongst the parties as to what constitutes due process and/or a public hearing in a charter revocation process. Petitioner claims that due process was denied because the record is incomplete. Respondents claim that the oral hearing was recorded and thus the record is complete. Respondents claim that they used the same format to revoke another charter school, but petitioner contends that that case differentiates itself from the one at bar, in that the DOE provided that charter school with a probationary period of approximately one year.
Respondents on one hand contend that based on the guidelines of 8 NYCRR 3.17, they were not required to have a public hearing. At the same time, the DOE alleges that the hearing was in fact public. The court disagrees with both contentions. Based on the affidavits of parents, the intervenors’ action and witness testimony, the court finds that the oral hearing did not constitute a “public hearing.” During witness testimony, it appears that the hearing was intended to be public, yet a number of parents and student affidavits state that they were told by the DOE that they would not be able to attend the hearing. The hearing was held during business hours and the list of attendees was supposedly required for admission, which limited public access. Based on the evidentiary information provided to this *830 court, the court does not believe that WCHS was afforded a public hearing. It is important to note that Education Law § 2857 (1) specifically states, in part, that “[a]t each significant stage of the chartering process, the charter entity and the board of regents shall provide appropriate notification to the school district in which the charter school is located and to public and nonpublic schools in the same geographic area as the proposed charter school.” Additionally, it states that “[s]uch a hearing shall be held within the community potentially impacted by the proposed charter school.” Moreover, the charter entity, in this case the Chancellor, is supposed to consider any comments raised by the community in making a decision. The statute specifically mentions the issuance, revision or renewal of a charter, however it can be concluded that the revocation of a charter would constitute a “significant stage” of the chartering process. It is evident to this court that the community impacted by the decision was not allowed a true opportunity to comment on the revocation in front of the Chancellor. The entire procedure utilized by the CSO for revocation is riddled with inconsistencies and lacks a certain level of transparency.
There are a number of other issues addressed in petitioner’s amended verified complaint related to conspiracy theories and conflicts of interest amongst the CSO, prior DOE employees, the Network and WCHS. Although the court finds that there may be conflicts of interest amongst the DOE and the chartering process, the court will not address these arguments as they were not sufficiently established to make an appropriate determination as to the truth of the matter.
Conclusion
Pursuant to CPLR 7803 (3), a court is to decide “whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed.” As discussed earlier, the arbitrary or capricious test chiefly relates to whether a particular action should have been taken or is justified and whether the administrative action is without foundation in fact. (See Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974].) In the instant action, the court finds that the Chancellor’s decision to revoke petitioner’s charter was arbitrary and capricious. The court does not make this determi *831 nation lightly as the standard for vacating an administrative agency’s determination is held to a high bar. However, the court does not believe it is abusing its discretion based on the facts of this case. After oral argument, the foregoing papers and witness testimony, the court finds that the Chancellor’s decision was not based on a complete and accurate picture of the facts. In determining that the decision was not justified, the court focuses directly on the process and procedure established by the CSO prior to the Chancellor making a decision. The DOE admits that there is no established process in place and although it attempted to follow NYSED procedure there were areas in which they had to diverge. First and foremost, the procedure outlined in 8 NYCRR 3.17 was intended to be applied to charter schools specifically covered by the Board of Regents; in lieu of that, it should only be applied in instances where there are “material and substantial violations” of the charter. The court does not believe that the DOE has effectively proved that the issues cited in the site report, the probationary notice and the intent to revoke could have been considered violations when the DOE was aware and in some cases involved in securing these very same agreement contracts. Even more significant is the fact that these same contracts were known prior to the approval of the second renewal charter. As such, the DOE had a perfect opportunity to reject WCHS’s application for renewal because the alleged “material and substantial” violations existed at that time. Although unsubstantiated, the DOE contends in certain circumstances that it was unaware of certain agreements, however that argument would effectually mean that the DOE is guilty of ineffectively handling its responsibilities of overseeing WCHS’s school operations and finances. In such a case, WCHS should not be penalized by a shortened probation period for the DOE’s failure to identify issues of “material and substantial” violations of the charter.
Prior to revocation, the DOE did not sufficiently establish why the probationary period was significantly shortened from 12 to 4 months, specifically where a number of bullet points in the notice of probation had a 12-month time frame. The court finds that the process the DOE followed to revoke the WCHS charter was arbitrary and capricious. WCHS was not afforded due process from the initial probationary period through to the decision to revoke. The formula for revocation resulted in a hybrid revocation process that was riddled with inconsistencies. Moreover, the DOE did not make known to the Chancellor its *832 awareness and/or involvement in some of WCHS’s alleged violations. The court finds that the DOE failed to provide adequate assistance for WCHS to remedy the issues and in fact operated as more of a hindrance by failing to respond to WCHS’s list of potential board members and the NFF questions for clarification. Lastly, the DOE utilized a process in which it changed an integral procedural aspect (i.e., oral argument before a panel) which does not sit favorably with this court.
It is imperative that a process for probation, as well as a process for initiating a charter revocation, be instituted in order to ensure consistency. The procedure for this revocation process was inconsistent with past practice and was not corroborated by any policy, regulation or protocol established by the DOE. The revocation of a charter impacts teachers, administrators, students, parents and the community as a whole. As such, decisions for revocation should be made thoughtfully and procedurally. The notice of intent to revoke in January 2012 was issued well after most students had already completed the high school application process. Moreover, the actual decision was rendered a day before the WCHS lottery was to be held and well after most non-WCHS students had been seated in a high school, placing WCHS students at a significant disadvantage. In addition, the court finds that the petitioner and intervenors were deprived of their right to participate in a “public hearing” before the charter was revoked.
In sum, this court finds that the April 3, 2012 decision to revoke WCHS’s charter should be vacated.